# 2001 DTA 168

**TRIBUNAL DE CIRCUITO DE APELACIONES
CIRCUITO REGIONAL III DE ARECIBO Y UTUADO**

SONIA N. RIVERA PEREZ, ET AL
Demandantes-Apelantes

v.

DR. JULIO NARVAEZ, ET AL.
Demandados-Apelados

Núm. KLAN-00-00215

San Juan, Puerto Rico, a 18 de mayo de 2001

Panel integrado por su Presidenta, la Juez Pesante Martínez,
y los Jueces Martínez Torres y Salas Soler

Martínez Torres, Juez Ponente

## TEXTO COMPLETO DE LA SENTENCIA

Apelan ante nos, Sonia N. Rivera Pérez, Roberto Román Morales y la Sociedad Legal de Gananciales compuesta por ambos (de aquí en adelante los demandantes-apelantes). Solicitan que revoquemos una sentencia dictada el 3 de noviembre de 1999 por el Tribunal de Primera Instancia, Sala Superior de Arecibo, en el caso de Daños y Perjuicios, Civil Núm. CDP-95-0110 (Hon. Marcos T. Calderón Vázquez, Juez). La referida sentencia tuvo el efecto de declarar sin lugar la demanda presentada por los demandantes-apelantes contra el Dr. Julio Narváez y el Hospital Dr. Susoni, Inc. (de aquí en adelante los codemandados-apelados). Como consecuencia, se ordenó el archivo y sobreseimiento de la causa de acción.

Contando con la comparecencia de los codemandantes-apelantes y del codemandado-apelado, Dr. Julio Narváez, y por los fundamentos que habremos de exponer, confirmamos la sentencia apelada.

### I

Los hechos probados en la vista sobre el aspecto de negligencia, según el Tribunal de Primera Instancia, luego de aquilatar la prueba testifical, pericial y documental presentada en juicio, son los siguientes:

*"La presente acción comenzó con la radicación de una demanda el 18 de abril de 1995. Se alegó, en síntesis, que la demandante Sonia Rivera Pérez, consultó al Dr. Julio Narváez en su oficina y acordaron que se sometería a una intervención quirúrgica para extracción de la vesícula y que la misma sería utilizando el procedimiento quirúrgico de laparoscopía.*

*A la demandante Rivera se le entregó una hoja sobre consentimiento para operar, con el fin de que la revisara y trajera firmada, luego de explicarle el proceso de laparoscopía.*

*Los demandantes Sonia Rivera y su esposo Roberto Rivera [sic] Morales, tuvieron dicha hoja de consentimiento con ellos por alrededor de veinticuatro (24) horas. Ambos firmaron el consentimiento.*

*La demandante Rivera entregó el referido consentimiento en la oficina del Dr. Narváez, sin hacer ninguna pregunta adicional sobre el mismo en cuanto a su contenido, ni sobre el procedimiento quirúrgico.*

*La demandante ingresó al Hospital Dr. Susoni y fue operada por el Dr. Narváez el 12 de octubre de 1994 mediante el procedimiento de laparoscopía.*

*El día de la operación, la demandante Sonia Rivera Pérez se quejó de dolor en el área de la operación.*

*El Dr. Narváez entendía que era normal este tipo de dolor post-operatorio. Las operaciones son calificadas por los doctores como trauma, por tanto, existe dolor.*

*A la demandante Sonia Rivera se le ordenó el medicamento Tylenol para el dolor. La Sra. Rivera no tenía fiebre posterior a la operación, su temperatura era 37.7.*

*La Sra. Rivera tampoco tenía leucositosis. Su conteo de glóbulos blancos era de 7,700, lo cual era normal.*

*Al día siguiente de practicársele la laparoscopía a Sonia Rivera, 13 de octubre de 1994, fue dada de alta.*

*La demandante, Sonia Rivera, regresó al hospital al día siguiente, 14 de octubre de 1994, con ictericia (piel amarillenta). De inmediato fue ingresada bajo los servicios del Dr. Narváez, con un diagnóstico de "condición post-colecistectomía".*

El viernes 14 de octubre de 1994, no había en Arecibo un gastroenterólogo invasivo con experiencia capaz de manejar el caso.

El codemandado, Hospital Dr. Susoni, no tenía equipos para hacer una prueba ERCP debido a que no existía un especialista (gastroenterólogo invasivo) capaz de llevar a cabo dicha prueba.

La paciente fue bien atendida en el Hospital Dr. Susoni y por el Dr. Julio Narváez los días 15, 16 y 17 (sábado, domingo y lunes) de octubre de 1994. Debido al cuidado que se le dio, su vida nunca estuvo en peligro.

La demandante fue dada de alta del Hospital Dr. Susoni el 18 de octubre de 1994 y transferida al Hospital San Pablo en Bayamón por gestiones realizadas por el Dr. Narváez.

El Dr. Julio Narváez hizo los arreglos para que el Dr. Fernando Fernández, gastroenterólogo invasivo (con oficina en Santurce), atendiera a la paciente-demandante el mismo día del traslado.

En el Hospital San Pablo de Bayamón, la demandante fue atendida por el gastroenterólogo, Dr. Fernando Fernández. Dicho galeno procedió a realizar la prueba conocida como ERCP ▇ para llegar a un diagnóstico, el cual no se podía hacer en el Hospital Dr. Susoni porque dicho hospital no contaba con los servicios de un gastroenterólogo, particularmente adiestrado para hacer este tipo de prueba diagnóstica.

Durante la estadía de la demandante en el Hospital San Pablo, se diagnosticó que lo ocurrido en la operación hecha por el Dr. Narváez había sido una laceración al ducto biliar. Se intentó corregir dicha laceración, pero ello no fue posible.

Luego de varias gestiones realizadas por los demandantes, éstos optaron por trasladarse a la ciudad de Nueva York. Allí fue al gastroenterólogo Dr. Tomás Izquierdo, quien tiene su práctica de medicina en dicha ciudad.

Más adelante, la demandante fue referida al Dr. Avran Cooperman quien operó a la demandante en el

*Community Hospital at Dobbs Ferry. Este galeno realizó una laparotomía en la cual se procedió a corregir la complicación surgida, lo cual se logró.*

*Desde el comienzo de la práctica de laparoscopía, se ha reportado la complicación de daño al ducto común biliar durante el procedimiento de laparoscopía. El por ciento de casos reportados ha bajado. No obstante, aun con los métodos y avances en la medicina, este tipo de lesión ocurre en un 0.3-0.5% al día de hoy."*

A la luz de las anteriores determinaciones de hechos y de las determinaciones de derecho realizadas, el Tribunal de Primera Instancia, Sala Superior de Arecibo, declaró sin lugar la demanda y decretó el archivo y sobreseimiento de la causa de acción de epígrafe.

El 3 de diciembre de 1999, los demandantes-apelantes radicaron en el tribunal apelado una *"Moción solicitando determinaciones adicionales de hechos y de reconsideración a tenor con las Reglas 43.3, 43.4 y 47 de las de Procedimiento Civil"*. Mediante resolución notificada a las partes el 27 de enero de 2000, el Tribunal de Primera Instancia declaró no ha lugar la solicitud de los aquí demandantes-apelantes. Sin embargo, el tribunal declaró con lugar aquellas determinaciones adicionales de hechos a las que la parte demandada-apelada no se opuso. Esas determinaciones de hechos son:

*"A preguntas del Juez Marcos Calderón, el Sr. Román, esposo de la demandante, expresó que la hoja de consentimiento para practicar una operación, que le entregó el Dr. Julio Narváez a la demandante, estaba en blanco al momento que se lo entregó para su firma en su casa.*

*Expresó también el Dr. González Inclán, que el daño fue uno iatrogénico, definido por el Diccionario de la Real Academia de la Lengua como un daño causado por el médico.*

*El Dr. González Inclán expresó que si después de una operación como la practicada en la demandante, el paciente presenta un cuadro de ictericia, se debe a una de tres razones; algún tipo de daño al sistema biliar, laceración del ducto común biliar o la presencia de piedras.*

*El Dr. González Inclán expresó que este tipo de daño biliar siempre debe ser sospechado después de una operación por laparoscopía cuando el paciente no mejora en el período post-operativo."*

Inconformes con la sentencia y resolución antes mencionadas, los demandantes-recurrentes acudieron oportunamente ante nos mediante recurso de apelación. Señalan que el Tribunal de Primera Instancia cometió cinco (5) errores al dictar sentencia en el caso de epígrafe que detallaremos más adelante. Como estos señalamientos se relacionan con la apreciación de la prueba por el tribunal sentenciador, debemos primero recapitular acerca de la obligación de la parte apelante de colocar a este Tribunal en posición para aquilatar los señalamientos de error relacionados con la prueba presentada en primera instancia.

## II

En un proceso de apelación en el que se solicita la revisión de la apreciación de la prueba testifical y pericial que hiciera el Tribunal de Primera Instancia, es preciso que se cumplan ciertos requisitos procesales, los cuales tienen el propósito de poner al tribunal revisor en condición de realizar dicha tarea.

Sobre ese particular, la Regla 19 del Reglamento del Tribunal de Circuito de Apelaciones, 4 L.P.R.A. Ap. XXII-A, dispone que cuando la parte apelante haya señalado algún error relacionado con la suficiencia de la prueba testifical o con la apreciación errónea de ésta por el tribunal apelado, discutirá dicho error en su escrito inicial, en forma preliminar, de acuerdo con la información y el recuerdo que tenga sobre dicha prueba. Luego, incluirá en el legajo una exposición estipulada o una exposición narrativa de la prueba o una transcripción. Según se desprende de la Regla 54.2(a) de Procedimiento Civil, 32 L.P.R.A. Ap. III, la exposición narrativa procederá solamente en ausencia de una exposición estipulada y tras la autorización expresa de este Tribunal.

La transcripción sólo procederá cuando la parte que la interese nos demuestre que no es posible preparar la exposición narrativa o estipulada, o que la exposición narrativa aprobada no expone adecuadamente la prueba oral. Véase Regla 54.3 de Procedimiento Civil, 32 L.P.R.A. Ap. III. No obstante, este Tribunal podrá ordenar como excepción, por iniciativa propia, y en el ejercicio de su discreción, que se prepare una exposición narrativa o una transcripción de la prueba oral o de una porción de ésta.

Dispone, además, la referida Regla 19 de nuestro Reglamento, *supra*, y la Regla 54.2(c) de Procedimiento Civil, *supra*, que dentro de los treinta (30) días siguientes a la presentación de la apelación, la parte apelante someterá ante este Tribunal un proyecto de exposición narrativa de la prueba oral pertinente al recurso, con una moción en la que justificará la necesidad de que se consideró la prueba oral para la adecuada disposición del recurso.

Se establece también en dichas reglas procesales que durante los veinte (20) días siguientes a la presentación del proyecto de exposición narrativa, las partes harán esfuerzos para lograr una exposición narrativa estipulada, tomando como base el proyecto presentado por la parte apelante. Si luego de transcurridos esos veinte (20) días no se produce una exposición estipulada, la parte apelada presentará dentro de los diez (10) días siguientes su oposición a la moción y al proyecto de estipulación de la parte apelante, y las razones que le impiden llegar a una exposición narrativa estipulada. [Regla 19, *id*; Regla 54.2 (c), *id*].

Dado el caso que la parte apelada se oponga al proyecto de exposición narrativa estipulada, este Tribunal podrá: (a) ordenar a las partes que se reúnan nuevamente para tratar de lograr una exposición narrativa estipulada; o (b) celebrar una vista ante el Tribunal para auscultar la posibilidad de que las partes armonicen o minimicen sus diferencias en cuanto a la exposición narrativa de la prueba; (c) ordenar a la parte apelante a que, conforme a la Regla 20 del Reglamento de este Tribunal, *supra*, o la Regla 54.2(e) de Procedimiento Civil, *supra*, proceda a obtener la aprobación del tribunal apelado respecto a la exposición narrativa o a cualquier porción de ella sobre la cual no haya habido acuerdo; u (d) ordenar la preparación total o parcial de una transcripción de la prueba oral, conforme a la Regla 76 del Reglamento de este Tribunal, *supra*, o la Regla 54.3 de Procedimiento Civil, *supra*. [Regla 19, *id*; Regla 54.2 (d), *id*].

En la Regla 19 del Reglamento de este Tribunal, *supra*, se reconoce nuestra autoridad para imponer costas y sanciones a la parte o a su abogado, de determinar que obstaculizaron el logro de una exposición estipulada de la prueba y ocasionaron retraso en cuanto a la solución del recurso.

Por su parte, la Regla 54.2(g) de Procedimiento Civil, *supra*, dispone lo siguiente:

*"Los términos dispuestos en esta regla podrán ser prorrogados mediante moción debidamente fundamentada y por justa causa. La parte apelante o peticionaria será responsable de cumplir con los plazos y procedimientos dispuestos en esta regla y de notificar al Tribunal de Circuito de Apelaciones cualquier incumplimiento o inconveniente relacionado. Su omisión de cumplir con esa responsabilidad impedirá que el Tribunal de Circuito de Apelaciones considere cualquier señalamiento de error del Tribunal de Primera Instancia en la evaluación de la prueba oral y podrá conllevar que se desestime el recurso."* [Enfasis suplido].

Como vimos, existe la posibilidad de que el incumplimiento con la presentación de la exposición de la prueba oral conlleve que este Tribunal no considere aquellos señalamientos de error relacionados con la evaluación de la prueba oral hecha por el tribunal apelado. Véanse además, *Acosta Vargas v. Tió*, 87 D.P.R. 262, 264 (1963); *Matos v. Gándara*, 69 D.P.R. 22 (1948).

Con relación a la ausencia de exposición narrativa de la prueba, el Tribunal Supremo expresó lo siguiente en *Benítez Guzmán v. García Merced*, 126 D.P.R. 302, 308 (1990):

*"Se impone un respeto a la aquilatación de credibilidad del foro primario en consideración a que 'sólo*

*tenemos... récords mudos e inexpresivos'. Esas apreciaciones deben ser objeto de gran deferencia en ausencia de circunstancias extraordinarias o indicios de pasión, prejuicio, parcialidad o error manifiesto que nos mueva a intervenir."* (Escolio omitido). *Pérez Cruz v. Hosp. La Concepción,* 115 D.P.R. 721, 728 (1984). Véase, también, *Sánchez Rodríguez v. López Jiménez, 116 D.P.R. 172, 181.*

*En el caso de autos no existe ninguna de estas condiciones. El juez de instancia aquilató y evaluó la prueba presentada y formuló determinaciones de hechos. No intervendremos con ese dictamen, sobre todo cuando no tenemos una exposición narrativa de la prueba. Regla 18 del Reglamento del Tribunal Supremo de Puerto Rico, 4 L.P.R.A. Ap. I-A."* [Enfasis suplido]

### III

En el caso de epígrafe, este Tribunal brindó una serie de oportunidades para que se presentara la exposición de la prueba oral, la cual es necesaria para revisar los senalamientos de error que versan sobre la suficiencia y apreciación de la prueba.

Mediante Resolución del 6 de abril de 2000, se le ordenó a los demandantes-apelantes que procedieran a radicar una transcripción privada que informaron tener, con el fin de considerarla como proyecto de exposición narrativa de la prueba. En dicha Resolución, se lo concedieron quince (15) días a la parte demandada-apelada para presentar mediante moción, sus objeciones detalladas y específicas relacionadas a la transcripción a ser presentada por los demandantes-apelantes.

El 24 de abril de 2000, los demandados-apelantes objetaron la transcripción de la evidencia testifical presentada por los demandantes-apelantes. Adujeron, entre otras objeciones, que la transcripción no estaba jurada, por lo que se desconocía su autenticidad y que carecía del testimonio de los demandantes y de su perito.

El 28 de abril de 2000, emitimos una segunda Resolución en la que se le concedieron veinte (20) días a los demandantes-apelantes para que presentaran un proyecto de exposición narrativa de la prueba, ya que la anterior no fue aceptada. En esa ocasión se les advirtió que el incumplimiento con lo ordenado daría lugar a que no se consideraran los señalamientos de error relacionados con la apreciación de la prueba hecha por el tribunal apelado, y a que se dieran por correctas las determinaciones de hechos realizadas por dicho foro. [Regla 54.2 (g), *supra*].

El 25 de mayo de 2000, emitimos nueva Resolución en la que se autorizó y ordenó a los demandantes-apelantes que obtuvieran la regrabación de los procedimientos en el Tribunal de Primera Instancia. Se concedieron sesenta (60) días desde la notificación de la Resolución para que dicha parte presentara ante nos un proyecto de exposición narrativa de la prueba o la exposición estipulada. Dejamos en pie la advertencia hecha previamente, relacionada con la posible aplicación de la Regla 54.2 (g), *id.*

Mediante una cuarta Resolución, fechada el 6 de julio de 2000, se le concedieron treinta (30) días a los demandantes-apelantes para que a partir de la entrega de la regrabación, presentaran ante nos su proyecto de exposición narrativa. Al mes siguiente, es decir, el 18 de agosto de 2000, emitimos Resolución en la que se concedieron cinco (5) días, contados a partir de la notificación de la misma, para que se informara el status de la regrabación y preparación de la exposición narrativa. Se recordó nuevamente la advertencia sobre lo dispuesto en la Regla 54.2 (g), *id.*

Luego de recibir una *"Moción Informativa sobre los Procesos de Regrabación",* emitimos el 5 de septiembre de 2000 una sexta Resolución en la que concedimos sesenta (60) días adicionales a los demandantes-apelantes para presentar su proyecto de exposición narrativa de la prueba.

El 13 de noviembre de 2000, le concedimos a los demandantes-apelantes hasta el 27 de noviembre de 2000 para que informaran el status de la transcripción a ser presentada a manera de exposición narrativa de la prueba.

Se advirtió nuevamente que de no comparecer se darían por renunciados los errores relativos a la apreciación de la prueba. El 28 de noviembre de 2000, nos informaron que en el Tribunal de Primera Instancia faltaban varios "*cassettes*" para finalizar la regrabación de los procedimientos del caso en instancia.

El 4 de diciembre de 2000, le concedimos a la demandante-apelante hasta el 29 de diciembre de 2000 para que presentaran la exposición narrativa estipulada, o de no lograrse la estipulación, el proyecto de exposición narrativa de la prueba. El 28 de diciembre de 2000, comparecieron ante nos mediante moción en la que informaron que aún faltaban tres "*cassettes*" de una hora para finalizar la regrabación de los procedimientos en el Tribunal de Primera Instancia.

Mediante una novena Resolución del 4 de enero de 2000, le concedimos a los demandantes-apelantes hasta el 29 de enero de 2001 para presentar la exposición narrativa estipulada de la prueba. Comparecieron ante nos el 12 de enero de 2001 informando que el 9 de enero de 2001 le fueron entregadas las regrabaciones del caso, por lo que tomaría tiempo escuchar las diez (10) grabaciones alegadamente existentes y luego estipular la exposición narrativa. Solicitaron en esa ocasión noventa (90) días adicionales para terminar esa gestión.

El 19 de enero de enero de 2001 le concedimos a los demandantes-apelantes hasta el 2 de marzo de 2001 para que radicaran ante nos la exposición narrativa estipulada de la prueba. Mediante "*Moción Solicitando Término Adicional*", radicada el 16 de febrero de 2001, los demandantes-apelantes informaron que estaban confrontando problemas para escuchar y entender las regrabaciones de los procedimientos. Nuevamente nos solicitaron noventa (90) días adicionales para terminar esa gestión.

En contestación a la referida moción, el 25 de febrero de 2001, concedimos hasta el 19 de marzo de 2001 para que se presentara la exposición narrativa estipulada. Se advirtió que no se concederían más prórrogas.

En respuesta a "*Urgente Moción Solicitando Término Adicional*", en la que los abogados de todas las partes expresaron que los "*cassettes*" donde se grabaron los procedimientos eran "*difíciles de escuchar*", emitimos Resolución el 14 de marzo de 2001 concediendo hasta el 6 de abril de 2001 para la presentación de la exposición narrativa estipulada de la prueba, debido a la "*particularísima*" situación expresada por los abogados. Advertimos que dicho termino sería final e improrrogable.

El día anterior a vencer el término concedido, es decir, el 5 de abril de 2001, ▮ recibimos "*Moción Objetando Exposición Narrativa y Solicitud de Desestimación*" del codemandado Hospital Dr. Susoni, a la que se unió el codemandado Dr. Julio Narváez. Expresaron que la exposición narrativa enviada a ellos el 23 de marzo de 2001 por la demandante-apelante era incompleta y, por ende, no era estipulable. Adujeron que la exposición no contiene los contrainterrogatorios hechos al perito de los demandantes-apelantes, el testimonio del demandado Dr. Julio Narváez, ni el contrainterrogatorio hecho al perito de la parte demandada.

El 9 de abril de 2001, mediante Resolución, se le ordenó a la parte demandante-apelante que mostrara causa por la cual no debíamos aplicar la Regla 54.2(g), *supra*, y omitir la consideración de los señalamientos de error dirigidos a impugnar la apreciación de la prueba oral, según apercibimos anteriormente.

En su "*Moción en Cumplimiento de Orden*", los demandantes-apelantes, en síntesis, alegaron que los demandados-apelados no habían presentado enmienda alguna a la exposición narrativa y que sólo presentaron objeciones "*que le convienen*" para lograr la desestimación del recurso. A tales efectos, nos solicitaron que conforme a la Regla 19 de nuestro Reglamento, *supra*, ordenáramos a la parte apelada que presentara sus objeciones a la exposición narrativa; a que estipularan lo que entendieran estipulable; y que ordenáramos la presentación de los testimonios o enmiendas a la exposición narrativa que los demandados-apelados entendieran pertinentes.

No nos convencen los planteamientos de los demandantes-apelantes. Como vimos en detalle, este Tribunal

advirtió en infinidad de ocasiones las consecuencias que contemplan las Reglas de Procedimiento Civil en caso de que la exposición de la prueba oral no fuera presentada. Al respecto, este Tribunal emitió trece (13) Resoluciones y concedió nueve (9) prórrogas. El último plazo concedido para la presentación de la exposición narrativa estipulada de la prueba venció el 6 de abril de 2001. La misma no fue presentada, a excepción de un proyecto de exposición narrativa enviado a los demandados-apelados que no refleja la totalidad o la mayoría de la prueba desfilada en instancia. No se nos ha presentado razón válida para la no presentación de la exposición narrativa estipulada dentro del último término concedido, el cual fue calificado previamente como improrrogable. Es por ello que damos por renunciados los señalamientos de error que van dirigidos a cuestionar la apreciación y suficiencia de la prueba oral desfilada en el Tribunal de Primera Instancia. Estos senalamientos no serían considerados, según lo dispone la Regla 54.2 (g) de Procedimiento Civil, *supra*.

## IV

De acuerdo a lo expresado por las partes en este caso, en el juicio llevado a cabo en el Tribunal de Primera Instancia, declararon dos peritos médicos, los demandantes-apelantes y el codemandado, Dr. Julio Narváez. A base de dichos testimonios, el tribunal apelado llegó a sus conclusiones de hechos y de derecho.

El alcance de la revisión judicial sobre cuestiones de hechos está regulado por lo dispuesto en la Regla 43.2 de Procedimiento Civil, 32 L.P.R.A., *supra*. Esta dispone, en su parte pertinente, que las determinaciones de hechos basadas en el testimonio oral no se dejarán sin efecto, a menos que sean claramente erróneas, y se dará la debida consideración a la oportunidad que tuvo el tribunal sentenciador para juzgar la credibilidad de los testigos.

Respecto a la revisabilidad de la apreciación de la prueba testifical, es norma establecida aquélla que nos impide intervenir con la apreciación de la prueba que hizo el Tribunal de Primera Instancia, en ausencia de pasión, prejuicio, parcialidad, o error manifiesto. *Rolón García v. Charlie Car Rental*, Opinión de 2 de junio de 1999, **99 J.T.S. 89**; *Belk v. Martínez*, Opinión de 30 de junio de 1998, **98 J.T.S. 92**.

La regla general, en cuanto a la presentación de prueba pericial ante los tribunales, apunta que: (1) el juzgador de los hechos no está obligado a aceptar las conclusiones de un perito; (2) los tribunales apelativos están en la misma posición que los foros primarios para evaluar y dirimir los conflictos entre las autoridades opuestas sobre controversias periciales medicas; (3) cuando la determinación de los foros de instancia se basa en prueba pericial y documental, los tribunales apelativos están en la misma posición que los tribunales de instancia para evaluar y llegar a sus propias conclusiones de derecho; y (4) al cumplir con su función revisora en casos de impericia médica, la decisión de los foros revisores debe estar fundada en la prueba vertida en el juicio por los peritos y en la prueba documental. *Rodríguez Crespo v. Hernández*, 121 D.P.R. 639 (1988). En los casos de impericia médica, la parte demandante viene en la obligación de establecer mediante preponderancia de la prueba que el tratamiento médico ofrecido por el demandado, de proveer el tratamiento indicado y correcto, fue el factor que con mayor probabilidad ocasionó el daño sufrido por el paciente. *Blas Toledo v. Hospital Nuestra Señora de la Guadalupe*, Opinión de 30 de junio de 1998, **98 J.T.S. 101**; *Rodríguez Crespo v. Hernández, id.*

No obstante lo anterior, es también principio jurídico sostenido que en ausencia de prueba, no es función de los foros revisores establecer a nivel apelativo los elementos requeridos por el Artículo 1802 del Código Civil, 31 L.P.R.A. 5298, para que se imponga responsabilidad a una parte por los daños sufridos por otra; es decir, la realidad del daño, el acto culposo o negligente, y que exista una relación causal entre el daño sufrido y la acción culposa o negligente. *Blas Toledo v. Hospital Nuestra Señora de la Guadalupe, id.*, a la pág. 1439

Por lo tanto, no podemos sustituir el criterio de los peritos médicos que declararon en el juicio a base de un estudio apelativo de la literatura disponible. *Ruiz Ríos v. Mark*, 119 D.P.R. 816 (1987).

## V

Los demandantes-apelantes, esposos Román Rivera, imputan al Tribunal de Primera Instancia la comisión de cinco errores. El segundo y cuarto error señalados apuntan directamente a la apreciación de la prueba que hizo el tribunal sentenciador. Los apelantes alegan que: (1) el tribunal erró al determinar que el daño que describió como iatrogénico (causado por el médico) no fue debido a negligencia médica, cuando de la propia literatura médica con que la parte demandante contrainterrogó al Dr. Julio Narváez y al perito de la parte demandada, Dr. José R. González, se desprende que este tipo de daño no ocurre, a menos que medie negligencia por parte del médico que operó; y (2) que el tribunal erró al determinar que el daño ocasionado a la demandante era uno inherente en el procedimiento de colicistectomía por laparoscopía, aun cuando el propio perito de la parte demandada reconoció que no podía atestiguar sobre si el daño causado a la demandante era inherente a la operación o era un acto negligente del Dr. Narváez.

Como mencionamos anteriormente, estos dos senalamientos de error van dirigidos a impugnar determinaciones realizadas por el tribunal apelado que están relacionadas directamente con la apreciación de la prueba que éste hiciera. Al no presentarse la exposición narrativa estipulada de la prueba que este Tribunal solicitó, no se nos ha colocado en posición de evaluar adecuadamente si el foro apelado incurrió en error al apreciar la prueba. En esas condiciones, no se deben alterar las determinaciones de hechos del tribunal de instancia. *Sánchez Rodríguez v. López Jiménez*, 116 D.P.R. 172, 181 (1985).

## VI

Además de los dos senalamientos de error antes senalados, los demandantes-apelantes sostienen que erró el Tribunal de Primera Instancia al no adjudicar en la sentencia la controversia de si hubo o no consentimiento ilustrado de parte de los demandados, máxime cuando en la página 12 de la sentencia expresó que la profundidad y detalle del consentimiento ilustrado podría estar en controversia.

Las normas prevalecientes sobre consentimiento informado se recogen en *Sepúlveda de Arrieta v. Barreto*, 137 D.P.R. 735 (1994). En dicho caso, el Tribunal Supremo se expresó de la siguiente forma, a las págs. 742-743:

*"En el pasado, nos hemos expresado sobre el deber médico de suministrar al paciente información sobre la naturaleza del tratamiento, los riesgos y los beneficios. La cuestión no es sencilla, pues existe diversidad de criterios. Los tribunales estatales en los Estados Unidos están divididos en dos tendencias con casi igual número de jurisdicciones adeptas. [Citas omitidas]. La tendencia mayoritaria es darle a este deber el alcance que determina la práctica prevaleciente en la comunidad médica. Algunos tribunales, al adoptar este criterio, han sostenido que una vez el actor prueba que el médico falló en informarle de riesgos inherentes a un procedimiento, el peso de la prueba recae sobre éste, quien deberá probar que èsa omisión está avalada por la práctica prevaleciente de la medicina. [Citas omitidas]*

*Estas jurisdicciones requieren generalmente que el demandante ofrezca el testimonio pericial para establecer que: (1) un profesional médico razonable siguiendo las exigencias prevalecientes en la práctica de la profesión, y situado en circunstancias similares, hubiera divulgado la información: y (2) que el demandado no cumplió ese criterio profesional prevaleciente."* [Citas omitidas].

El Tribunal Supremo rechazó el criterio del paciente razonable originado en *Canterbury v. Spence*, 464 F.2d. 772 (D.C. Cir. 1972), y adoptó, por el contrario, el criterio del profesional de la medicina. El médico no tiene la obligación de informar sobre riesgos que sean remotos, que hayan ocurrido en pocas ocasiones o que sean meramente hipotéticos, pero sí tiene el deber de divulgar al paciente los riesgos razonablemente previsibles. *Sepúlveda de Arrieta v. Barreto, supra; Rodríguez Crespo v. Hernández, supra.* Bajo este criterio, se le requiere al demandante presentar prueba pericial para establecer que en dicha situación en particular la mejor práctica de la medicina requería la divulgación de la información y que el demandado no cumplió con dicho requisito.

En el caso ante nuestra consideración, el tribunal determinó como hechos probados que a la codemandante-apelante, Rivera, se le entregó una hoja sobre consentimiento para operar, con el fin de que la revisara, luego de

explicarle el proceso de laparoscopía. [Determinación de Hechos Núm. 2] También se concluyó que los demandantes-apelantes tuvieron dicha hoja de consentimiento por espacio de veinticuatro (24) horas y fue firmada por ellos. [Determinación de Hechos Núm. 3]. La demandante entregó el consentimiento firmado sin hacer pregunta adicional sobre el mismo, ni sobre el procedimiento quirúrgico. [Determinación de Hechos Núm. 4].

En la sentencia, el tribunal apelado indica que de acuerdo a la prueba desfilada, hubo conversación sobre los riesgos de la operación, aunque no se conoce la profundidad y detalle de la misma. Sin embargo, el tribunal apuntó también a la credibilidad que le mereció el testimonio de los demandantes-apelantes. A tales efectos, el tribunal expresó lo siguiente:

*"La demandante Sonia Rivera y su esposo, entre sí, declararon haber tenido el documento en su poder por alrededor de veinticuatro (24) horas; lo firmaron y no preguntaron. Es difícil pensar que se va a someter a alguien a un procedimiento quirúrgico y se firman documentos sobre permisos y consentimiento con espacios en blanco y luego pretenden alegar que no se les explicó nada. No estamos hablando de personas menores y/o incapacitadas, estamos hablando de seres que se desenvuelven día a día en el ajetreado mundo en que vivimos."* [Sentencia apelada, a la pág. 12; enfasis suplido]

Como vimos, el tribunal apelado hizo un juicio de credibilidad y concluyó que era increíble que no se le hubiesen explicado a la demandante-apelante los riesgos de la operación a la que se sometería y, aún así, ésta firmara un consentimiento para operar que tenía espacios en blanco.

No se nos ha puesto en condición de intervenir con la apreciación de la prueba que hizo el tribunal apelado. No contamos con los criterios para determinar si hubo pasión, prejuicio, parcialidad o error manifiesto en esa determinación, máxime cuando desconocemos si los demandantes-apelantes presentaron la prueba pericial requerida para establecer que en su situación en particular, la mejor práctica de la medicina requería la divulgación de cierta información y que el demandado no cumplió con dicho requisito.

## VII

El tercer error señalado por los demandantes-apelantes, apunta a que erró el Tribunal de Primera Instancia al utilizar en la sentencia literatura médica que nunca fue presentada como evidencia por la parte demandada-apelada, producto de un proyecto de sentencia y no conforme con la prueba presentada.

La práctica de solicitar proyectos de sentencia a los abogados de las partes, no está reñida con nuestro ordenamiento. Dicha práctica alivia la carga de trabajo y aligera el calendario judicial. Por tal razón, el acto de aceptar un proyecto de sentencia no es, de por sí, censurable.

Ahora bien, los proyectos de sentencia deben ser usados siempre como documentos de trabajo (working papers). Jamás debe un juez delegar su función adjudicativa a un abogado postulante. *"[L]a sentencia que emite un tribunal de instancia debe enteramente ser el producto de su pensamiento, análisis y criterio jurídico... y no de los abogados de las partes".* Lasso v. Iglesia Pentecostal La Nueva Jerusalem, 129 D.P.R. 219, 254 (1991) (Opinión concurrente y disidente del Juez Asociado Rebollo López); Román Cruz v. Díaz Rifas, 113 D.P.R. 500 (1982); Malavé v. Hospital de la Concepción, 100 D.P.R. 55 (1971).

Los demandantes-apelantes, esposos Román Rivera, sostienen que *"la sentencia emitida en el presente caso es un ejemplo de lo que significa firmar a ciegas un proyecto de sentencia".* (Escrito de Apelación, a la pág. 14). Aducen que esa es la única explicación para que en dicha sentencia se cite literatura que, alegan, jamás fue utilizada por la parte demandante. Dicen además que la única literatura médica presentada en el juicio fue cuando la parte demandante confrontó y contrainterrogó con literatura médica, tanto al doctor codemandado, Dr. Julio Narváez, como al perito Dr. González.

Sobre este particular es menester señalar que tampoco se nos ha puesto en condición de juzgar la veracidad de

cuál fue la literatura médica que tuvo ante sí el tribunal apelado o con cuál de ella fue que se contrainterrogó a los peritos. Tampoco se nos ha presentado prueba que sustente la alegación de que la sentencia en el presente caso sea un proyecto firmado "*a ciegas*". Por tales fundamentos, estamos impedidos de entrar a considerar el tercer error señalado.

## VIII

Como quinto y último error, los demandantes-apelantes señalan que erró el tribunal al no encontrar solidariamente responsables tanto al cirujano como al hospital, por realizar la operación a la que fue sometida la demandante-apelante en una institución que no tenía los equipos, ni facilidades para hacer una prueba conocida como ERCP. Enfatizar que el tribunal determinó en la sentencia que el tratamiento óptimo al ducto común biliar depende del reconocimiento temprano de dicha lesión y resalta la importancia del ERCP para reconocer e identificar la misma.

Al delinear los contornos de la responsabilidad de un médico en el desempeño de sus funciones profesionales, se ha establecido la norma de cuidado médico exigible al amparo del Artículo 1802 del Código Civil, *supra*. Se espera que el médico ofrezca aquella atención médica que a la luz de los modernos medios de comunicación y enseñanza, y conforme al estado de conocimiento de la ciencia y la práctica prevaleciente de la medicina, satisfacen las exigencias generalmente reconocidas por la profesión. *Ramos Escobales v. García González*, 134 D. P.R. 969, 975 (1993); *Rodríguez Crespo v. Hernández, supra.*

Dentro del ámbito de sus funciones, se le reconoce al médico una latitud amplia en su discreción al momento de formular su juicio profesional en cuanto al diagnóstico y tratamiento médico. El Tribunal Supremo ha rechazado imponer responsabilidad cuando el médico ha utilizado su buen juicio profesional y el mismo es cónsono con lo razonablemente aceptado por muchos sectores de la profesión médica. *Ramos Escobales v. García González, supra; Reyes v. Phoenix Assurance*, 100 D.P.R. 871, 876 (1972).

Al médico le acompaña una presunción de que ha ejercido un grado razonable de cuidado y de que el tratamiento brindado fue adecuado. El hecho de que un paciente haya sufrido un daño o que el tratamiento no haya tenido éxito, no crea una presunción de negligencia en contra del médico. La parte demandante no podrá descansar para rebatir esa presunción en una mera posibilidad de que el daño se debió al incumplimiento de parte del médico de su obligación profesional. Ello requiere que la relación de causalidad no se establezca a base de una mera especulación o conjetura. *Ramos Escobales v. García González, supra; Sáez v. Municipio de Ponce*, 84 D.P. R. 535 (1962).

En cuanto a los hospitales, nuestro derecho vigente les exige que ejerzan el cuidado y las medidas previsoras que un "*hombre prudente y razonable*" desplegaría ante determinadas circunstancias y que ofrezcan a sus pacientes la atención médica que su condición requiera. *Blas Toledo v. Hospital Nuestra Señora de Guadalupe, supra; Márquez Vega v. Martínez Rosado*, 116 D.P.R. 397 (1985). Para determinar cuál ha de ser esa atención, puede servir de índice la práctica generalmente reconocida por la propia profesión médica. *Blas Toledo v. Hospital Nuestra Senora de la Guadalupe, id.; Crespo v. H.R. Psychiatric Hosp., Inc.*, 114 D.P.R. 796 (1983).

La responsabilidad que se le puede imponer a un hospital, se puede dividir en dos vertientes. La primera surge cuando la persona acude directamente a la institución hospitalaria en busca de ayuda médica y el hospital le "*provee*" a ésta los facultativos médicos que le atenderán. En ese caso, se podría imponer responsabilidad solidaria al hospital y al médico, no empleado, responsable del acto de impericia médica. *Márquez Vega v. Martínez Rosado*, 116 D.P.R. 397, 407 (1985). La segunda vertiente se da en aquellos casos en que la persona va directamente a la oficina privada del médico, acuerda con éste el tratamiento a recibir, y acude a un hospital en particular por recomendación del médico, ya que dicha institución le provee el privilegio de utilizar las facilidades de la misma. En esa segunda vertiente, el hospital, como regla general, no debe responder por el acto negligente del médico no empleado, a quien en primera instancia, y de manera principalísima, el paciente le confió el cuidado de su salud. *Márquez Vega v. Martínez Rosado, id.*

A pesar de lo anteriormente expuesto, el Tribunal Supremo ha señalado que razones de política pública exigen que los hospitales tengan la obligación continua de seleccionar cuidadosamente los médicos a quienes se le faciliten sus facilidades; exigir que dichos médicos se mantengan al día a través de cursos de mejoramiento profesional; y mantenerse al día en cuanto a los adelantos tecnológicos habidos, entre otros. *Márquez Vega v. Martínez Rosado, id,* a la pág. 410.

Por su parte, en *Lozada v. E.L.A.,* 116 D.P.R. 202 (1985), el Tribunal Supremo discutió la responsabilidad de los hospitales por faltar al deber de tener determinado equipo médico. A tales efectos, se expresó de la siguiente manera, a la pág. 215:

*"Aunque aspiramos al ideal de excelencia en la práctica de la medicina, la determinación de lo que constituye negligencia, por la posesión o carencia de equipo, necesariamente se nutre de diversos factores. Esta fórmula se explica, porque al fijar la norma debemos y queremos ser justos y razonables. No vamos a exigir requisitos y condiciones que hagan imposible la práctica de la medicina en Puerto Rico o que hagan económicamente prohibitivos los servicios médicos. Oliveros v. Abréu, 101 D.P.R. 209, 226 (1973).*

*Para evaluar en el caso de autos si existía el deber del Estado de poseer un equipo de arteriografía en el Departamento de Urología del Hospital Regional -que es la premisa cardinal en que basó el foro de instancia la responsabilidad-, como lugar donde se realizaban biopsias renales, debemos considerar ese deber configurado en la previsibilidad, y en el elemento rector que la complementa, la razonabilidad. Esta a su vez se nutre de factores adicionales, tales como onerosidad, apremio, recursos, y sobre todo, el reconocimiento y aceptación de alternativas por la profesión médica."* [Enfasis suplido].

Al aplicar la anterior normativa jurisprudencial al caso de autos, es menester preguntarnos si era previsible una condición como la que fue desarrollada por la demandante-apelante, Sra. Rivera, luego de haber sido sometida a una laparoscopía para extraer su vesícula. Se alega ante nos que durante la laparoscopía realizada por el codemandado-apelado, Dr. Narváez, a la codemandante-apelante, Sra. Rivera, se le laceró el ducto biliar común, provocándole con ello *"un derrame del líquido biliar, lo que dejó a Sonia en cuidado intensivo".* [Escrito de Apelación, a la pág. 21.

Ante esta situación, es necesario señalar nuevamente que no se nos ha puesto en posición de realizar un análisis concienzudo de la evidencia testifical y pericial que tuvo ante sí el tribunal apelado. No podemos hacer una determinación de que el Hospital Dr. Susoni carecía de un equipo vital, cuando carecemos de elementos para concluir si era razonable tener ese equipo médico o si existían otras alternativas médicas para diagnosticar la condición desarrollada por la demandante-apelante. Por otro lado, vimos que los médicos disponen de una amplia latitud en su discreción al momento de formular su juicio profesional en cuanto al diagnóstico y tratamiento médico.

Por lo tanto, no podemos concluir que al momento de la operación, el equipo para realizar la prueba de ERCP no era un equipo sofisticado o especializado de poco uso o si, por el contrario, era uno básico que debía estar en todos los hospitales. Véase, *Blas Toledo v. Hospital Nuestra Señora de la Guadalupe, supra,* a la pág. 1433.

Además, se desprende de las determinaciones de hechos del Tribunal de Primera Instancia, que luego de la operación practicada y de que surgieran los síntomas que llevaron de regreso a la demandante- apelante al hospital (indicando una laceración al ducto biliar común), la paciente fue bien atendida y su vida nunca estuvo en peligro, (Determinación de Hechos Núm. 14], aun cuando no se le realizó la antedicha prueba. Además, el tribunal señaló en sus conclusiones de derecho que en el Hospital Susoni *"sin duda, todo el esfuerzo estuvo encaminado a lograr un diagnóstico cierto de la condición post-operatoria que presentaba esta paciente".* [Sentencia apelada, a la pág. 14; Ap. Apel., a la pág. 16]. Concluyó, también, el tribunal que *"todos los médicos que declararon en el juicio, estuvieron de acuerdo con que el tratamiento que se le dio a la paciente-demandante por parte del Dr. Julio Narváez y del Hospital Dr. Susoni, desde el 14 de octubre al 18 de octubre de 1994, ▆ fue adecuado y correcto."* [Sentencia apelada, a la pág. 20; Ap. Apel., a la pág. 22].

Por las razones antes señaladas, no estamos en posición de cambiar la apreciación que tuvo el tribunal apelado al desestimar la demanda contra el codemandado Hospital Dr. Susoni y el codemandado Dr. Julio Narváez, máxime cuando las sentencias del tribunal apelado gozan de una presunción de corrección, y en este nivel apelativo carecemos de una exposición narrativa estipulada de la prueba que pueda rebatir esa presunción.

## IX

En virtud de todo lo anterior, se dicta Sentencia confirmando la emitida por el Tribunal de Primera Instancia, Sala Superior de Arecibo.

Así lo acordó y ordena el Tribunal, y lo certifica la Subsecretaria General.

Gladys E. Ortega Ramírez
Subsecretaria General

### ESCOLIOS 2001 DTA 168

**1.** De acuerdo al Escrito de Apelación de los demandantes-apelantes, estas siglas correponden a *"Endoscopic Retrograde Cholangiopancreatography"*.

**2.** De los autos del caso, se desprende una carta fechada el 5 de abril de 2001, la cual fue enviada por la representación legal de los demandantes-apelantes a la representación legal de los demandados-apelados. En ella reconocen que al próximo día vencía el término para la exposición narrativa estipulada de la prueba, y aún no tenían la referida exposición narrativa. La carta explora la posibilidad de que todos los abogados solicitaran una nueva prórroga ante este Tribunal para la presentación de la misma.

**3.** Fechas en las que la demandante-apelante fue ingresada nuevamente al Hospital Dr. Susoni con los síntomas que sintió luego de la operación de laparoscopía.